UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHARLES R. MCCARTNEY and
JALYNN MCCARTNEY,

       Plaintiffs/Counter-Defendants,

       v.

PLATTE RIVER INSURANCE
COMPANY,

       Defendant/Counter-Plaintiff.

Case No. 19-cv-6527

Judge John Robert Blakey

## MEMORANDUM OPINION AND ORDER

Plaintiffs Charles and JaLynn McCartney sued Defendant Platte River Insurance Company seeking a declaratory judgment that they have no obligation to indemnify Platte River for claims made against surety bonds Platte River issued. *See* [101]. Platte River countersued, seeking indemnification on several of those surety bonds. *See* [124]. The parties have now cross-moved for summary judgment, [156], [164]. For the reasons explained below, the Court grants in part, and denies in part, Platte River's motion [156] and denies the McCartneys' motion [164].

## I. Factual Background & Procedural History[1]

Two characters feature prominently in this drama. The first character is a tangled web of similarly named corporate entities, all starting with United Skys, Inc.,

---

[1] The Court reproduces the following facts after referencing the McCartneys' Third Amended Complaint [101], Platte River's Rule 56.1 Statement [157], [160] and the McCartneys' response thereto [161]; the McCartneys' Rule 56.1(b)(3) Statement of Additional Facts [162]; the McCartneys' Local Rule 56.1 Statement [165], Platte River's response thereto [174], and Platte River's Rule 56.1(b)(3)

a commercial skylight company Charles McCartney founded in 1986. The second is a 2008 General Indemnity Agreement executed by Charles and his wife, JaLynn McCartney. An understanding of both remains necessary for resolution of the pending motions.

### A.    The United Skys Morass

Charles McCartney founded United Skys, Inc., an Illinois corporation, in 1986, and he served as the president and CEO of the company, which manufactured and installed commercial skylights. [101] ¶ 2; [161-12] 10:24–14:9. At some point in the first half of 2015, Charles began to think about selling the company because he was getting older and wanted "an exit strategy." [161-12] 26:1–9. Ultimately, he decided to sell the company to a private equity group spearheaded by Donald Hempson. But the transaction was hardly straightforward.

In advance of the transaction, Charles formed CM Merger, LLC, which merged with United Skys, Inc. such that the surviving entity was CM Merger, LLC. [101] at 257, 260–63. The record remains unclear as to how CM Merger, LLC became United Skys, LLC. But the merger documents show that, at the time of the merger between United Skys, Inc. and CM Merger, LLC, "all debts, liabilities and duties of the Constituent Entities shall thenceforth attach to the surviving entity, and may be enforced against it to the same extent as if said debts, liabilities and duties had been incurred or contracted by it." *Id.* at 263. Thus, post-merger, United Skys, Inc.'s obligations became CM Merger, LLC's obligations.

---

Statement of Additional Facts [176].

On April 27, 2016, Charles also formed United Skys Holdings, Inc. to own (and sell) United Skys, LLC's membership units, once United Skys, LLC was formed. *See* [101] at 252; [101] ¶¶ 3, 89.

As mentioned above, on May 2, 2016, United Skys, Inc. merged into CM Merger, LLC, with the resulting entity being named United Skys, LLC. [162] ¶ 20. On that date, Charles maintains, United Skys, Inc. ceased to exist. *Id.* Charles does not explain how or why United Skys, LLC escaped inheriting United Skys, Inc.'s obligations, which passed to CM Merger in the merger.

On the other side of the transaction, Hempson and the PE group formed United Skylights, LLC to purchase United Skys, LLC's membership units from United Skys Holdings, Inc., and, on May 6, 2016, United Skys Holdings, Inc. sold all its membership units in United Skys, LLC to United Skylights, LLC. [101] ¶ 2. Thus, on May 6, 2016, United Skylights, LLC acquired 100% of United Skys, LLC's membership interests. [174] ¶ 21.

From May 6, 2016, to September 22, 2017, Charles owned 10% of United Skylights, LLC's membership units, and he served as a consultant to United Skys, LLC from May 6, 2016, through November 2016. [101] ¶ 2; [174] ¶ 27. The Letter of Intent signed by the PE team that formed United Skylights, LLC, stated that, from June 30, 2015, through the date of United Skylights, LLC's purchase of United Skys, LLC, Charles was required to continue to conduct United Skys, Inc.'s business in the ordinary course and in a manner consistent with past practices. *See* [101] ¶¶ 52, 53. Although the parties dispute Charles involvement in the company post-merger, they

3

agree that Charles maintained a financial stake and continued to serve as a consultant in the new company, at least for a time. [174] ¶ 27.

### B.    The 2008 GIA and United Skys' Relationship with Platte River

Platte River's relationship with the McCartneys and United Skys began in 2008. On January 18, 2008, United Skys, Inc. executed a subcontract to manufacture and install metal framed skylights at a construction project located in Cherry Hill, New Jersey. [101] ¶ 24. Between January 18, 2008, and April 8, 2008, United Skys, Inc. requested that Platte River issue performance, labor and material payments bonds for the Cherry Hill project on United Skys, Inc.'s behalf. *Id.* ¶ 25. As a condition precedent to issuing the bonds, Platte River required that United Skys, Inc., Charles, and JaLynn execute a General Indemnity Agreement. *Id.* ¶ 26. On April 8, 2008, they did so. [161-1] at 44–48.

The 2008 General Indemnity Agreement, executed by Charles (both individually and as President of United Skys, Inc.) and JaLynn (together, the "Undersigned"), named Platte River as Surety, United Skys, Inc. as Principal, and Charles and JaLynn as "the Undersigned"; it required these parties to indemnify Platte River,

> against all demands, claims, loss, costs, damages, expenses and fees including any attorneys' fees whatsoever, and for and from any and all liability therefore, sustained or incurred by the Surety by reason of executing or procuring the execution of any said Bond(s), or any other Bond(s), which maybe already or hereafter are executed for or at the request of the Principal or the Undersigned or any of them, or renewal or continuation thereof; or sustained or incurred by reason of making any investigation on account thereof, prosecuting or defending any action brought in connection therewith, obtaining a release therefrom, recovering or attempting to recover any salvage in connection therewith

4

or enforcing by litigation or otherwise any of the agreements herein contained.

*Id.* at 45, 44–47.

Under the 2008 GIA, the McCartneys agreed that their indemnification obligation constituted a "continuing obligation," that applied to "any and all Bonds" heretofore or hereafter "executed by the Surety on behalf of the Undersigned (whether acting alone or as a co-adventurer) until this Agreement shall be cancelled according to its terms." *Id.* at 46.

To this end, the Agreement allowed any of the undersigned to "notify, in writing, the Surety at its Branch Office, 1600 Aspen Commons, Middleton, WI 53562, of the withdrawal by the Undersigned from this Agreement." *Id.* The withdrawal provision required any withdrawing party to send such notice "by certified or registered mail" and to state in the notice "when, not less than thirty days after receipt of such notice by the Surety, such withdrawal shall be effective." *Id.* Under the GIA, a withdrawing party "will not be liable under this Agreement for any Bond(s) executed by the Surety after the effective date of such notice" but would remain "fully liable" for bonds executed "prior to effective date of such notice." *Id.* Finally, the 2008 GIA included provisions requiring that any changes or modifications be made in writing and requiring the indemnification obligation to be "liberally construed so as to fully protect and indemnify the Surety." *Id.* at 47.

With the GIA in place, on April 11, 2008, three days after the McCartneys and United Skys, Inc. executed the 2008 GIA, Platte River issued its first bond on behalf of United Skys, Inc.: Performance and Payment Bond 40434527, relating to the

5

Cherry Hill project. [101] ¶ 38; [161-13] 94:20–96:4; [165-1] at 49–53. No claims were ever made against that bond, and Platte River closed it at some point in 2009 or 2010. [101] ¶¶ 39–40.

Charles claims United Skys, Inc. never requested any other bonds from Platte River and that, in his view, the 2008 GIA was intended to be a one-time deal for the Cherry Hill project. *See* [161-13] 97:23–98:5. And, indeed, the record shows that Platte River did not issue any other bonds for United Skys between April 2008 and May of 2016.

Kasie Morrison, who worked first as an administrative assistant and then as a project manager for United Skys, testified that she was not aware of any bonds issued by Platte River between 2008 and 2016. [161-16] 15:7–9, 19:24–20:2, 39:5–8. She testified that, in approximately 2009 or 2010, United Skys consolidated bonding with its insurance provider and moved its bonding brokerage into Ds&P Insurance; the bonding company Ds&P Insurance used was Westfield. *Id.* 34:10–21, 37:2–7. She testified that, when United Skys was awarded a project (and once it had a fully executed contract), she would send a request for bonds, along with the contract, to the surety or the broker on behalf of the surety, to order the bond. *Id.* 46:7–47:10. She did not request the bond immediately but waited until she had "the full billing approved through the contractor"—meaning "the way we've laid out our schedule of values, that was approved, and we could actually bill for the bonds." *Id.* 47:20–48:5. She also testified that either she or an admin (under her direction) would request that a performance and payment bond be issued; and she did not necessarily have to

6

talk to Charles McCartney before requesting a bond. *Id.* 48:6–22. But generally, she would not request a bond until United Skys knew it could start billing on a project and generating cash flow. *Id.* 49:2–10.

In 2015, Morrison requested a bond relating to a construction project at Dulles, and Westfield issued the bond; she also recalled that she requested a bond relating to a project at Fort Bliss Hospital. *Id.* 49:24–50:4, 55:22–56:1. She testified that, as of March 2, 2016, United Skys had a fully executed subcontract for the LANOIA canopies project and was in a position to request a bond but had not yet done so. *Id.* 66:3–67:2. United Skys had a signed subcontract for the Scheels Johnstown Project before May 6, 2016, but she did not recall whether the company had requested a bond by that date. *Id.* 68:13–22.

Eric Ragone, who served as a surety producer for Ironwood, which served as United Skys' broker once Hempson and his team assumed control of United Skys, testified that in late February or early March of 2016, Jeff Ellis engaged him, on behalf of his team, to assist in procuring surety bonds for a company they had chosen to acquire or target; that company turned out to be United Skys. [161-14] 8:6–25, 18:22–19:1, 33:2–9, 60:12–62:8. As part of setting up that business relationship, Ragone requested the offering memo for the transaction, historical and forward-looking financial information, and any information on bonds they may be seeking in the near future. *Id.* 62:9–63:4. As part of this process, United Skys provided the 2008 GIA, which showed United Skys had an ongoing bond program with Platte River. *See id.* 63:20–24. Ellis also provided the contracts relating to the New Orleans airport

7

projects, which, as Morrison conceded, were ready for bonding by the time the United Skys, Inc. and CM Merger LLC merger took place. *Id.* 64:22–65:2.

Ragone testified that Kasie Morrison was his primary contract at United Skys. *Id.* 74:22–73:1. He worked with Jessica Boone, an underwriter at Platte River, to secure the bonds United Skys requested. *Id.* 53:7–55:4.

Ragone testified that Platte River required United Skylights, LLC to execute a second GIA on May 11, 2016, based upon Platte River's knowledge that United Skylights, LLC purchased all United Skys, Inc.'s business interests. *Id.* 113:12–18.

Jessica Boone, the underwriter at Platte River who handled United Skys' bonds, provided consistent testimony. She said that Eric Ragone first submitted the United Skys account to her for underwriting in approximately March of 2016. [157-5] 77:24–78:3, 79:16–81:10. Boone testified that when Ragone brought the file to her, he provided financial information for United Skys, as well as the Letter of Intent, which outlined the plans for the going forward company. *Id.* 81:4–82:20, 84:21–88:14. Based upon the information she received from Eric Ragone, provided by the PE team, she understood that Charles McCartney planned to stay at the company for five years after the merger as part of his buyout agreement. *Id.* 85:24–86:12. She testified that, under the 2008 GIA, the duty to indemnify would arise from bonds that Platte River issued at the request of the undersigned or for them. *Id.* 60:8–12, 65:7–15. So, someone who worked for the company besides Charles or JaLynn could (and did) request bonds for the company. *Id.* 65:16–17, 66:5–8.

Boone also testified that, when Ragone submitted the file to her, the PE team indicated that they wanted company indemnity only, with no personal indemnity, and they did not want to have to post collateral (funds to be held to guarantee performance or to protect the surety against possible claims). *Id.* 88:15–89:16. Ragone also asked for a rate of 2%, but Boone would not agree to that because the company did not "have good financial numbers for what it was going to look like after the purchase." *Id.* 92:6–10. Boone offered a rate of 3% based in part upon "the fact that Mr. McCartney was going to remain with the company for five years" and that "his buyout was tied to the performance of the company because that adds additional security." *Id.* 94:4–15.

Boone further testified that Platte River was asked to write the bonds for United Skys' work on the New Orleans Airport; the contracts for the work were signed by Charles McCartney prior to the sale of the company in the name of United Skys Inc., and Platte River was asked to write bonds for that contract in the name of United Skys Inc. *Id.* 107:3–24. She testified that the bonds would have to be written in the name of the company on the project contract. *Id.* 108:3–15. Boone testified that Platte River required, and United Skys provided, $500,000 in collateral to write the bonds. *Id.* 118:7–22.

Finally, Boone testified that Platte River also required United Skylights LLC, United Skys LLC, and Technico Builders Inc. to execute a General Indemnity Agreement in 2016 because going "forward these were companies' indemnities that I did not have that we may be required to provide bonds for." *Id.* 133:20–134:4, 135:8–

24. Boone testified that the indemnity obligations covered in the 2016 GIA did not supersede the obligations spelled out in the 2008 GIA; instead, the 2016 GIA is "in addition to" the 2008 GIA. *Id.* 126:13–20. She testified "this is additional indemnity for the people whose indemnity we did not have that were going to be bonded principals." *Id.* 135:8–24. Boone understood post-merger Donald Hempson would serve as CEO and Charles McCartney would serve as president of the emerging company. *Id.* 152:16–153:7.

### C.     Post-Merger Bonds, Claims and Conduct

Ultimately, in addition to the Cherry Hill project bonds issued in 2008, Platte River issued several performance and payment bonds for or on behalf of United Skys in 2016, 2017, and 2018, as follows:

- on August 12, 2016, Platte River issued two performance and payment bonds (**Bond No. 41350367 and Bond No. 41350368**)[2] for work at the New Orleans Airport on a project managed by Hunt Gibbs Boh Metro, [161-7] at 2–4, 6–7;

- on June 29, 2017, Platte River issued Bond No. 41370728 for work relating to the Scheel's All Sports project, *id.* at 22–26;

- on December 4, 2017, Platte River issued Bond No. 41386621 for construction relating to Chapin Middle School, *id.* at 28–31;

- on December 11, 2017, Platte River issued **Bond No. 41386623** for an escalator canopies project with F.H. Paschen, *id.* at 33–36;

- on January 22, 2018, Platte River issued Bond No. 41389555, *id.* at 38–42;

- on June 11, 2018, Platte River issued **Bond No. 41389647** for work relating to Sampson Construction's Texas project known as "The Colony," *id.* at 44–47;

---

[2] The bolded bond numbers reflect bonds for which Platte River seeks indemnification.

- on July 10, 2018, Platte River issued **Bond No. 41397583** in connection with a construction project at the University of Kentucky College of Law, *id.* at 49–50; and

- on November 6, 2018, Platte River issued **Bond No. 41403033** in connection with Whiting-Turner's "Shops at Riverside" project; *id.* at 52–55.

Except for the New Orleans Airport project bonds (which identified United Skys, Inc. as the principal), all of these bonds identified United Skys, LLC as principal. *See id.* at 2–4, 6–7, 22–26, 28–31, 33–36, 38–42, 44–47, 49–50, 52–55.

Platte River received claims on Bond No. 41403033; Bond No. 41350367; Bond No. 41350368; Bond No. 41389647; Bond No. 41386623; and Bond No. 41397583 (in bold above). [157-7] at 2. When claims started rolling in on the issued bonds, Platte River reached out to the indemnitors, including Charles McCartney.

On March 11, 2019, for the first time, Charles advised Platte River directly (through its claims representative, Ron Wills), that "United skys" was "sold in 5-2016" and that he had "no interest in the bond claims." [161-7] at 59. Charles suggested Platte River should contact "don hempson ceo of united. As well as sy peck usi attorney." *Id.* A claims file note created an hour after Charles sent his email shows that Wills advised Charles that Platte River did not "have a request for release from him" and that Charles indicated he would "start the process for a release from the GIA going forward." *Id.* at 60. The 2008 GIA indemnitors sent a termination notice to Platte River on March 21, 2019. [161] ¶ 3. The record shows that none of the original indemnitors ever terminated, or withdrew from, the 2008 GIA before March 2019.

### D. The Parties' Claims

The parties agree that, under Illinois law, when United Skys, Inc. became United Skys, LLC, that transaction constituted a merger, [161] ¶ 6; they disagree, however, about the legal effect of the merger. Platte River says that the surviving company, United Skys, LLC, became responsible for and liable for all the liabilities and obligations of United Skys, Inc., including its obligations under the 2008 GIA. [160] ¶ 7. The McCartneys concede that point but argue that the continuing indemnity obligation survived only until May 6, 2016, when United Skylights, LLC purchased the membership interests of United Skys, LLC. [161] ¶ 7. The argument remains predicated upon corporate status, rather than any affirmative deal term.

Additionally, the McCartneys formally terminated the 2008 GIA March 21, 2019, even though they claim their indemnification obligation ended when United Skys, Inc. ceased to exist as a legal entity after May 2, 2016. *Id.* ¶ 3. Platte River's claims remain predicated upon the theory that the McCartneys stayed on the hook under the 2008 GIA until they formally terminated their indemnification in March of 2019. Platte River argues that, because the McCartneys did not terminate their indemnification obligation until March of 2019, they remain liable under the 2008 GIA for all of the bonds issued to United Skys. Platte River seeks summary judgment as to liability on its indemnification counterclaims, and on the McCartneys' claims. *See* [156].

The McCartneys, on the other hand, claim their indemnification obligation ended when United Skys, Inc. ceased to exist on May 2, 2016, the date of the merger

12

with United Skys, LLC. They argue that they have no obligation to indemnify Platte River on bonds issued post-merger, because Platte River issued those bonds, not at the request of anyone identified in the 2008 GIA, but at the request of United Skylights, LLC, the owner of United Skys, LLC. They also argue that the 2016 GIA extinguished their indemnification obligation. As a result, they seek summary judgment in their favor on their claims and on Platte River's counterclaims. *See* [164].

## II.     Applicable Legal Standards

A motion for summary judgment can be granted only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The motion will be granted only if, viewing the record in the light most favorable to the nonmoving party, no jury could reasonably find in the nonmoving party's favor. *McDonald v. Hardy*, 821 F.3d 882, 888 (7th Cir. 2016).

The nonmovant, though, "must do more than raise a metaphysical doubt as to the materials facts. Rather, she must come forward with specific facts showing that there is a *genuine issue for trial.*" *Miller v. Am. Fam. Mut. Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000) (quotation omitted). In a case involving cross-motions for summary judgment, the Court construes "all inferences in favor of the party against

13

whom the motion under consideration is made." *Tegtmeier v. Midwest Operating Eng'rs Pension Tr. Fund*, 390 F.3d 1040, 1045 (7th Cir. 2004) (quotation omitted).

### III.    Discussion & Analysis

The McCartneys argue that they are entitled to summary judgment on their declaratory judgment and breach of contract claims (Counts I and III) because the bonds issued by Platte River after United Skys, Inc. emerged as United Skys, LLC and, ultimately, United Skylights, LLC, were not issued at Charles' or United Skys, Inc.'s request; nor could they have been (at least as to the latter), because United Skys, Inc. no longer existed. *See* [163].

Platte River seeks summary judgment in its favor on the issue of liability under the 2008 GIA as to all disputed bonds. Platte River argues that the material facts remain undisputed: the parties executed the 2008 GIA and the Agreement remained in effect during the relevant period. *See* [158].

### A.    The McCartneys Remained Bound by the 2008 GIA through March 2019

Taking the easy questions first, the record shows that the 2008 GIA remained in effect when all of the above-referenced bonds were issued. Additionally, the record provides no basis to conclude that the 2016 GIA superseded the 2008 GIA.

Although Charles testified that, in his view, the 2008 GIA was a "one time deal" for the Cherry Hill project, that view remains at odds with the plain language of the contract. Under the 2008 GIA, the McCartneys agreed that their indemnification obligation constituted a "continuing obligation," that applied to "any and all Bonds" heretofore or hereafter executed by the Surety on behalf of the

14

Undersigned (whether acting alone or as a co-adventurer) until this Agreement shall be cancelled according to its terms." [161-1] at 46.

Moreover, although the McCartneys and United Skys had the right under the 2008 GIA to withdraw from or terminate their indemnification obligation at any time with respect to future bonds, the agreement itself specifies the process for achieving such withdrawal or termination. The Agreement allowed any of the undersigned to "notify, in writing, the Surety at its Branch Office, 1600 Aspen Commons, Middleton, WI 53562, of the withdrawal by the Undersigned from this Agreement." *Id.* Moreover, the withdrawal provision required any withdrawing party to send such notice "by certified or registered mail" and to state in the notice "when, not less than thirty days after receipt of such notice by the Surety, such withdrawal shall be effective." *Id.* And there is no question that the McCartneys did not perform the contractually required termination steps until March of 2019. This is not a case where the party seeking termination fell slightly short or fails on a mere technicality; the McCartneys never took any steps to terminate their indemnification obligation until March of 2019.

Indeed, Charles admitted he never sent a notice terminating the 2008 GIA. [161-12] 49:15–24, 71:2–6, 71:25–72:25. He testified that post-closing on the United Skys, LLC deal, bonding agreements existing prior to May 6, 2016, were supposed to be terminated within 120 days; but he was not aware whether any such termination took place. [161-13] 17:1–19:3. He testified that no one told him the termination had been accomplished, and he never contacted anyone to confirm that termination had

15

been affected. *Id.* In March of 2019, Charles put the bonding company on notice that they were no longer a viable business and no longer had anything to do with the bonds. *Id.* 124:13–125:15. Charles and JaLynn sent the formal notice of withdrawal on March 21, 2019. *Id.* 126:7–21.

Likewise, Helmut Gerlach, the attorney who represented United Skys, Inc. and the McCartneys in the merger, acknowledged that post-merger, his clients would remain on the hook for any existing bonds, testifying:

> I knew there were bonding agreements in place and we wanted to make sure the bonding agreements for what is called the work in progress, so those projects which were specifically in progress at that time, it was our understanding that Mr. McCartney had to stay on and so we wanted to make sure that should anything happen with those few specific work in progress matters, that he would be protected.

[157-3] 35:1–12. Gerlach acknowledged that liability remained as to the Scheels and New Orleans Airport projects. *See id.* 67:7–68:20.

Gerlach also testified that he negotiated a Settlement and Release Agreement dated September 22, 2017, between Charles and the PE group that bought United Skys giving Charles a sum of money post-merger in exchange for a release of claims against the buyers. *See id.* 52:4–54:9. Yet, Gerlach testified that he had never seen the 2008 GIA and that the indemnity agreements were irrelevant to him because that aspect of the deal fell under the buyer's due diligence, not the seller's. *Id.* 56:22–58:21. In short, Gerlach's testimony bolsters the conclusion that no one—not Charles, not United Skys, not the PE guys—terminated the McCartneys' obligations under the 2008 GIA at or around the time of the merger. To the contrary, they instead conveyed the impression that the corporate operation would remain business as usual and gave

16

Platte River no reason to suppose that anything had changed from an underwriting perspective with regard to bonding authority or indemnification obligations.

In addition to arguing that the 2008 GIA terminated by operation of law at the time of the merger (an argument this Court rejects), the McCartneys argue that the 2016 GIA executed by United Skylights, et al., superseded the 2008 GIA. But that argument remains belied by both the language of the 2008 GIA and the testimony of Platte River's underwriting team. The GIA's "continuing obligation" provision states that the indemnification obligation continues "as to any and all Bonds (whether or not covered by any separate application signed by Undersigned, and any such application shall be considered as merely supplemental to this Agreement)." [161-1] at 47. Jessica Boone, Platte River's underwriter also testified that the indemnity obligations covered in the 2016 GIA did not supersede the obligations spelled out in the 2008 GIA; instead, the 2016 GIA is "in addition to" the 2008 GIA. [157-5] 126:13–20. She testified "this is additional indemnity for the people whose indemnity we did not have that were going to be bonded principals." *Id.* 135:8–24. Such testimony remains undisputed, and the McCartneys have offered no factual or legal basis to support their claim that the 2016 superseded the 2008 GIA. And that failure remains fatal at this point. *See Brown v. CACH, LLC*, 94 F.4th 665, 667 (7th Cir. 2024) ("Summary judgment is the 'put up or shut up' time in litigation.") (quoting *Schacht v. Wis. Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)).

17

For the above reasons, this Court finds that the McCartneys' indemnification obligation remained intact after the merger until Charles terminated it in March of 2019.

### B. The LANOIA Bonds were Issued By or On Behalf of United Skys, Inc.

Even though the indemnification obligation remained when Platte River issued the bonds that are the subject of this lawsuit, that alone does not make Platte River entitled to summary judgment. The McCartneys remained liable under the 2008 GIA to indemnify Platte River only on claims on Bonds "executed for or at the request of the Principal or the Undersigned or any of them"—with the Principal being United Skys, Inc. and the Undersigned being the McCartneys. [161-1] at 45, 48.

Platte River unquestionably issued the New Orleans Airport (LANOIA) bonds naming United Skys, Inc. as the principal, *see* [161-16] at 327–28 (Bond No. 41350368), 330, 332 (Bond No. 41350367). Although the McCartneys argue this was improper or an oversight, the record demonstrates that the bonds were, in fact, executed "for or at the request of" United Skys, Inc. Initially, the General Contractor, Hunt Gibbs Boh Metro, awarded the airport canopies and skylight projects to United Skys, Inc. as the Subcontractor, and Charles signed those contracts on behalf of United Skys, Inc., as did Kasie Morrison, as United Skys, Inc.'s Office Manager. *See* [161-16] at 188–214. Charles conceded that he signed the contracts with Hunt Gibbs on behalf of United Skys, Inc. and that the contracts were fully executed at the time of the merger.

Kasie Morrison agreed; she testified that, as of March 2, 2016, United Skys had a fully executed subcontract for the LANOIA canopies project and remained in a position to request a bond but had not yet done so. [161-16] 66:3–67:2. She testified that the company continued to bond and contract in the name of United Skys, Inc. to avoid the hassle of amending the underlying contracts for which the bonds were required; and the PE team deliberately used the United Skys name ambiguously to preserve the impression that the business was continuing to operate post-merger as before. *Id.* 150:14–151:6. This testimony too supports the notion that these bonds were requested by or for United Skys, Inc. which was named in those contracts. Every witness who discussed the matter agreed that even if the bonds were issued after the merger, they were issued for or at the request of United Skys, Inc. which had to have the bonds to be able to perform under the contract Charles signed.

Jessica Boone, Platte River's underwriter, also testified that Platte River was asked to write the bonds for United Skys' work on the New Orleans Airport; she testified that the contracts for the work were signed by Charles McCartney prior to the sale of the company in the name of United Skys Inc., and Platte River was asked to write bonds for that contract in the name of United Skys Inc. [157-5] 107:3–24. She testified that the bonds would have to be written in the name of the company on the project contract. *Id.* 108:3–20.

Likewise, the subcontract itself supports Morrison and Boone's understanding that the contract and the bond had to be written in the same name, and that United Skys, Inc. was appropriately named as the Principal in those bonds. *See* [161-16] at

19

274–75 (requiring Subcontractor—United Skys, Inc. —to "furnish" and "keep in force during the term of the Subcontract the required bonds, being both a performance bond (for the Work) and labor and material payment bond (covering the cost of the Work) guaranteeing that Subcontractor will perform its obligations under the Subcontract and will pay for all labor and materials furnished for the Work"); *see also id.* at 289 (requiring bonds to be "furnished upon the earlier of the date of execution of this Subcontract [no later than March 2, 2016] or the commencement of any Subcontract Work"). Additionally, the subcontract between United Skys, Inc. and Hunt Gibbs Boh Metro specifically included a clause prohibiting the subcontractor (United Skys, Inc.) from assigning or transferring the subcontract once awarded. *See* [161-16] at 261.

Thus, Charles' ability to tout the contract as a selling point to Don Hempson and the PE team depended upon United Skys, Inc. continuing to exist through the term of the New Orleans Airport project work. In fact, on September 9, 2016, while Charles remained a consultant with United Skys, Donald Hempson wrote to Hunt Gibbs Boh Metro indicating that Charles was "no longer President of United Skys" and that, effective May 6, 2016, Hempson had taken over as CEO, with "full authority to execute on behalf of United Skys." [161-16] at 336. No one reading this letter would think that United Skys, Inc. had ceased to exist or that the company's legal or indemnification obligations had changed. And no doubt this was the point, as assigning or transferring the subcontract remained prohibited.

Charles benefitted from this appearance as well: if United Skys, Inc. really did "cease to exist" on May 2, 2016, the company would have forfeited the New Orleans Airport work, which would no doubt have reduced the price Hempson and his team would be willing to pay. Charles accepted their money knowing that the subcontract work, which he bid for and secured, carried associated bond requirements; his authorized office manager requested the bonds for the contract, written in United Skys, Inc.'s name on behalf of United Skys, Inc.; and Charles cannot now disclaim the authorization of those bonds.

In short, based upon the record, the Court finds that Platte River issued the New Orleans Airport/LANOIA bonds, Bond No. 41350367 and Bond No. 41350368, for or at the request of United Skys, Inc. and Charles McCartney, and the McCartneys thus remain liable to indemnify Platte River for claims made on those bonds, even if Don Hempson ultimately signed those bonds on behalf of United Skys LLC.

### C. Issues of Fact Remain as to Whether the Remaining Bonds were Issued for or on behalf of United Skys, Inc.

The record includes evidence to suggest that some of the other bonds were also issued for or at the request of United Skys, Inc.

Initially, the record confirms that the parties blurred the line between United Skys, Inc. and United Skys, LLC, behaving, and causing others to behave, as if the companies constituted the same entity. Indeed, although the McCartneys' claims and arguments depend upon a strict observance of corporate formalities, the record shows that the relevant constituents played loosey-goosey with the companies. Kasie Morrison testified that the company continued to bond and contract in the name of

21

United Skys, Inc. to avoid the hassle of amending the underlying contracts for which the bonds were required, [161-16] 150:14–151:6; the PE team deliberately used the United Skys name ambiguously to preserve the impression that the business was continuing to operate post-merger as before. *Id.*

Charles' behavior bolstered the notion that he remained involved with the operation of the company. Charles testified that, post-closing, he continued to serve as a consultant for the surviving entity for about six months. [161-13] 21:16–23:2. He testified that Platte River was told that he was going to stay on for five years, and that he had no idea whether anyone ever told Platte River that he was no longer with the company after he left. *See id.* 40:5–11. Charles remained involved, even if the PE team perhaps overstated his involvement to give the impression that the business continued to operate as before. In fact, when questions about the company's ownership and financials came up in 2016, the PE group shored up its file with Platte River by reaffirming Charles' involvement and posting additional escrow funds, which Charles approved and even funded. Even then, Charles did not disavow or even mention the 2008 GIA. Tellingly, Charles' March 11, 2019, email to Ron Wills (which purportedly terminated or disavowed Charles' indemnification obligation), references the new company's attorney, not as counsel for United Skys, LLC but as "sy peck usi attorney." [161-7] at 59.

Moreover, Kasie Morrison testified that she never requested Charles McCartney's release from any indemnity agreement with Platte River; nor did anyone else, as far as she is aware. [161-16] 149:5–23. Morrison conceded that United Skys

22

never told Hunt Gibbs Metro (the contractor on the LANOIA projects) that United Skys, Inc. no longer existed and had become United Skys, LLC and that the company deliberately left the documents in United Skys, Inc.'s name because they did not want to go through administration costs and time to amend all the open contracts; she testified that as new contracts came in, they "made sure that those said LLC on them." *Id*. 155:21–156:11. Except those contracts did not say LLC. Morrison conceded that the Johnstown Scheels bond also named United Skys, Inc. as the principal. *Id*. 152:8–22. She testified that this was an oversight but admitted that she never told Platte River about the oversight. *Id*. 152:23–153:17. So too, the bonds issued for the Louis Armstrong Airport projects. *Id*. 153:21–154:20. Both sets of bonds identify United Skys, Inc. as the principal. She saw the bonds—she served as Project Manager at that time—and yet she never notified anyone at Platte River that this was a mistake. *Id*. Indeed, the company at times simply referred to itself as "United Skys" to avoid the specificity. *Id*. 155:21–156:11.

It remains unsurprising that the surety and broker had certain opinions about the company's status when the key players continued to treat the companies as one, and such conduct supports a finding that the bonds at issue were requested by or for United Skys, Inc.

But Ron Wills, who handled claims for Platte River, testified that, if you wanted to know who requested a particular bond, you would "just have to go the bond itself and read who the principal was." *See* [157-6] 90:2–21. He testified that the bond told you on whose behalf it was written. *Id*. By this logic, the bonds Platte River

issued naming United Skys, LLC as principal—including Bond No. 41370728, Bond No. 41386621, Bond No. 41386623, Bond No. 41389555—were written "on behalf of" United Skys, LLC, not United Skys, Inc.

Along the same lines, Kasie Morrison testified that she ordered the bonds, other than the LANOIA project bonds, on behalf of United Skys, LLC and in the name of United Skys, LLC.

Eric Ragone testified similarly and acknowledged that he asked Platte River to issue bonds at times on behalf of United Skys, Inc., and at times on behalf of United Skys, LLC. This recognition on the part of Platte River's broker and claims handler, and on the part of the person requesting the bonds for United Skys, indicates that the bonds issued in the name of United Skys, LLC would fall outside the scope of the 2008 GIA.

Additionally, issues of fact remain as to whether the company that emerged after the PE group's acquisition constituted a different company than the company that existed the day before the merger. Charles concedes that United Skys, LLC was the entity that existed after United Skys, Inc. merged with CM Merger, and those companies were all his, formed before the PE group transaction. The parties' November 13, 2015, Letter of Intent suggests that the PE group wanted to acquire/recapitalize Unites Skys, Inc. but continue the business operation as before, at least initially. [161-16] at 396–401. And the parties certainly behaved as if the company continued on as before the merger, just with new management and leadership. *See, e.g.,* [157-1] at 6 (email from Eric Ragone to Jessica Boone describing

24

the merger and indicating that "the owner and senior management will continue to operate the company under the supervision of a new President"); [165-11] at 135 (same and attaching, among other things, Kasie Morrison's resume, printed on United Skys Inc. letterhead and identifying her as a "USI" employee from 2005 to the present); [161-16] at 336 (Hempson's September 9, 2016, letter to Hunt Gibbs Boh Metro advising of a change at the helm of "United Skys").

In short, issues of fact remain as to whether Platte River wrote Bond No. 41403033 (the Shops at Riverside Bond), Bond No. 41389647 (the Colony Bond), Bond No. 41386623 (the Paschen Bond), and Bond No. 41397583 (the UK Law Bond) for or at the request of United Skys, Inc. or the McCartneys or their authorized agents (as opposed to someone else or some other entity). As a result, summary judgment in either side's favor remains inappropriate as to any indemnification obligation on these bonds.

## IV.    Conclusion

For the reasons explained above, the Court grants in part, and denies in part, Platte River's motion for summary judgment [156] and denies the McCartneys' motion for summary judgment [164]. The Court grants Platte River's motion as to liability for claims against the New Orleans Airport/LANOIA Bonds (Bond No. 41350367 and Bond No. 41350368), but otherwise denies the motion.

Dated: March 9, 2026                                        Entered:

_____
John Robert Blakey
United States District Judge

25